Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| R.M., individually and on behalf of T.M. a minor,<br><br>       Plaintiff,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, and the PRICEWATERHOUSECOOPERS LLP HEALTH & WELFARE BENEFITS PLAN<br><br>       Defendants. | COMPLAINT<br><br>Case No. 2:22-cv-00167 - DAK |

Plaintiff R.M. individually and on behalf of T.M.[1] a minor, through his undersigned

counsel, complains and alleges against Defendants United Healthcare Insurance Company,

United Behavioral Health (collectively "United"), and the Pricewaterhouse Coopers LLP Health

& Welfare Benefits Plan ("the Plan") as follows:

---

[1] T.M. identifies as male, uses male pronouns, and has gone through the legal processes necessary to change his name and gender. However, many of the records pertaining to this case predate this process and refer to him using a feminine name and female pronouns.

## PARTIES, JURISDICTION AND VENUE

1. R.M. and T.M. are natural persons residing in Texas. R.M. resides in Denton County and T.M. resides in Collin County. R.M. is T.M.'s father.

2. United Healthcare Insurance Company is an insurance company headquartered in Hennepin County, Minnesota and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. United Behavioral Health (also operating under the brand name Optum) is the mental health arm of United Healthcare Insurance Company. United Behavioral Health processed and denied the residential treatment claims at issue in this case.

4. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). R.M. was a participant in the Plan and T.M. was a beneficiary of the Plan at all relevant times. R.M. and T.M. continue to be participants and beneficiaries of the Plan.

5. T.M. received medical care and treatment at Outback Therapeutic Journeys, LLC ("Outback") from April 20, 2020, to July 9, 2020, and New Haven from July 9, 2020, to July 30, 2021. These are licensed treatment facilities located in Utah County Utah, which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

6. United denied claims for payment of T.M.'s medical expenses in connection with his treatment at Outback and New Haven.

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United has a claims processing and appeal office in Salt Lake City and processed the claims at issue in this case at its Salt Lake City, Utah facility, and because the treatment at issue took place in Utah.

9. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside Utah will likely lead to substantially increased litigation costs he will be responsible to pay and that he would not incur if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both his and T.M.'s privacy will be preserved.

10. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### T.M.'s Developmental History and Medical Background

11. T.M. was adopted by R.M. at a very young age. T.M. often felt unwanted by his birthmother since his birthmother did not place her other children up for adoption.

12. T.M. has a history of depression, anxiety, gender identity issues, suicidal ideation, a suicide attempt via overdose, and disordered eating. T.M. struggled to make and keep

friends and was often bullied by others. He experienced particularly heightened anxiety in social situations.

13. T.M. had run away from home multiple times, often behaved aggressively, and was destructive of property. Starting in 2016, T.M. received numerous treatment interventions prior to the treatment at issue in this case, in an attempt to successfully address his mental health issues (including multiple inpatient hospitalizations) but these treatments were not successful.

**Outback**

14. T.M. was admitted to Outback on April 20, 2020, following the failure of effective treatment at other levels of care.

15. In a series of Explanation of Benefits ("EOB") statements, United denied payment for T.M.'s treatment under code AY:

> THE PROCEDURE CODE SUBMITTED IS NOT ELIGIBLE FOR PAYMENT. THEREFORE, NO BENEFITS ARE PAYABLE FOR THIS SERVICE.

16. On December 7, 2020, R.M. submitted an appeal of the denial of payment for T.M.'s treatment. R.M. reminded United that he was entitled to certain protections during the appeal process under ERISA, including a full, fair, and thorough review using appropriately qualified reviewers which took into account all of the information he provided, which gave him the specific reasoning for the adverse determination, referenced the specific plan provisions on which the decision was based, and gave a description of any materials necessary to perfect the claim.

17. He asked that the reviewer have training in the details of MHPAEA and encouraged them to reach out to Dr. Michael Gass, an expert in the field of outdoor behavioral healthcare.

18. R.M. argued that coverage for Outback was available under the terms of the insurance policy. He quoted the policy's definition of an Alternate Facility which stated:

> Alternate Facility – a health care facility that is not a Hospital and provides one or more of the following services on an outpatient basis, as permitted by law:
>
> - surgical services;
> - Emergency Health Services; or
> - rehabilitative, laboratory, diagnostic or therapeutic services.
>
> An Alternate Facility may also provide Mental Health or Substance-Related and Addictive Disorders Services on an outpatient basis or inpatient basis (for example a Residential Treatment facility).

19. He wrote that Outback was duly licensed by the State of Utah, accredited by a national therapeutic organization, and acting in accordance with all governing state regulations. He argued that accordingly Outback was an eligible expense and should have been approved.

20. He stated that while United did have guidelines for wilderness therapy, these guidelines clearly stated that they were superseded by state and federal law as well as the terms of the actual insurance policy.

21. He additionally identified an exclusion present in the insurance policy which stated:

> Wilderness Treatment Wilderness therapy is excluded under the benefit plan as it is Unproven and not Medically Necessary for the treatment of emotional, addiction, and/or psychological problems including but not limited to:
>
> - adjustment disorders; mood disorders;
> - anxiety disorders; conduct disorders;
> - impulse disorders;
> - social functioning disorders;
> - substance related disorders; and
> - attention-deficit hyperactivity disorder.

22. R.M. then quoted the definition of Unproven Services from the insurance policy which stated:

Unproven Services – health services, including medications that are determined not to be effective for treatment of the medical condition and/or not to have a beneficial effect on health outcomes due to insufficient and inadequate clinical evidence from well-conducted randomized controlled trials or cohort studies in the prevailing published peer-reviewed medical literature:

- Well-conducted randomized controlled trials are two or more treatments compared to each other, with the patient not being allowed to choose which treatment is received.
- Well-conducted cohort studies from more than one institution are studies in which patients who receive study treatment are compared to a group of patients who receive standard therapy. The comparison group must be nearly identical to the study treatment group.

23. He argued that Outback did not meet the definition of unproven services as defined in the insurance policy. He wrote that Outback was safe and that outdoor behavioral health programs were proven to be effective in the peer reviewed literature. R.M. included some of this literature with the appeal.

24. He then quoted the Plan's definition of experimental and investigational services and argued that Outback did not meet this definition either.

25. He included a letter from Dr. Michael Gass Ph.D., LMFT, on the benefits of outdoor behavioral health services. Dr. Gass stated that modern therapeutic outdoor behavioral health programs "are a far cry" from the wilderness bootcamps of the past which had little therapeutic value and relied primarily on "punishment, confrontation, and deprivation."

26. Dr. Gass contended that modern outdoor behavioral health programs were safe, proven, and had been the subject of multiple trials and studies which demonstrated their efficacy and showed that they were generally beneficial to adolescents who had mental health or substance abuse problems. All at a reduced cost compared to traditional residential treatment care.

27. R.M. also included a letter from Federal Hearings and Appeal Services Inc., an external review agency who found that given the growing body of evidence for outdoor behavioral health programs, "this mode of treatment is no longer an experimental treatment." The letter stated this was especially true now that the National Uniform Billing Committee had assigned outdoor behavioral health programs their own revenue code.

28. R.M. asked United to answer whether the National Uniform Billing Committee – the governing body for forms and codes in medical billing – would assign an experimental service its own revenue code. He contended that it would clearly not do so, and that it was nonsensical for United to classify any such service as experimental when it had been widely recognized as an effective treatment modality.

29. In addition, R.M. alleged that United's denial was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for mental health services were provided at parity with comparable medical or surgical services. R.M. identified skilled nursing, inpatient rehabilitation, and hospice facilities as some of the medical or surgical analogues to the outdoor behavioral health treatment T.M. received.

30. R.M. identified *Johnathan Z. v. Oxford Health Plans* as a case that had found that the insurer's exclusion of wilderness treatment was impermissible as it applied an exclusion to mental health treatment because it took place in an outdoor environment and this limitation was more restrictive than the limitations placed on analogous medical or surgical services.

31. He wrote that United was imposing both facial and as-applied limitations which violated MHPAEA. He argued that United did not exclude full categories of skilled nursing,

rehabilitation, or hospice by classifying them as investigational, nor did it flag facilities with their revenue code for an automatic denial in the same manner that it did for outdoor behavioral health services. He alleged that United could not discriminate by facility type in this manner.

32. R.M. wrote that he had demonstrated he was entitled to relief under MHPAEA as he had shown the Plan is subject to MHPAEA, had shown the Plan provided both medical and mental health benefits, had demonstrated that the appropriate analogues to the treatment at Outback included skilled nursing, rehabilitation, and hospice care, and he had demonstrated that a disparity existed between outdoor behavioral health services and their medical/surgical counterparts.

33. R.M. asked United to perform a parity compliance analysis on the Plan and to provide him with physical copies of any and all documentation used. He requested that if he was incorrect concerning United's MHPAEA noncompliance that it demonstrate this by providing him with specific examples of it limiting the availability of medical and surgical treatment in the same way it did for mental health treatment.

34. He asked in the event that the denial was upheld to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements, any clinical guidelines used in the determination as well as their medical or surgical equivalents, whether or not these were used to evaluate the claim, as well as any reports from any individual who evaluated the claim, along with their names, qualifications, and denial rates. (collectively the "Plan Documents")

35. He asked that in the event United did not possess these documents or was not acting on behalf of the Plan Administrator in this regard that it forward his request to the appropriate entity.

36. In a letter dated January 19, 2021, United upheld the denial of payment for T.M.'s treatment. The letter was attributed to an "Advocate" and denied payment due to:

> The billed service is considered a non-covered service per Optum's Behavioral Clinical Policy: Wilderness Therapy.

37. On February 22, 2021, R.M. submitted a level two appeal of the denial of payment for T.M.'s treatment. He wrote that despite the fact that he had reminded United of its ERISA obligations during the review process, it had not complied with its minimum obligations.

38. He pointed out that United had not responded to any of the arguments he raised during the appeal process and had ignored all of the concerns he raised, including his contention that United's denial violated MHPAEA. He asked how he was supposed to enter into a productive dialogue about the denial of T.M.'s treatment when United refused to respond to his concerns.

39. R.M. again argued that outdoor behavioral health treatment was not experimental and attached another decision by an independent review agency in which the review organization, Permedion, overturned an insurer's denial for wilderness treatment and stated that this type of care was not experimental and was safe, proven, and effective.

40. He stated that United was required to act in his best interest but through its actions had "prevented me from effectively appealing this denial of benefits." He contended that United's reviewer had not been qualified to review the claim and again asked for a reviewer with experience concerning MHPAEA as well as someone knowledgeable

concerning generally accepted standards and clinical best practices for outdoor behavioral health services.

41. He again asked United to carefully consider the information he had provided and once more asked to be given a copy of the Plan Documents.

42. In a letter dated March 16, 2021, Senior Medical Coding Analyst, Aditi Sharma, denied payment due to:

> The billed service is considered a non-covered service per the Optum Behavioral Clinical Policy- Wilderness Therapy for Revenue Code 1006 on dates of service 04/20/2020 through 07/09/2020.

### New Haven

43. T.M. was admitted to New Haven on July 9, 2020.

44. In a letter dated August 24, 2020, Elizabeth Burkin, LSW, denied payment for T.M.'s treatment from July 9, 2020, forward. The letter gave the following justification for the denial:

> I have reviewed your child's treatment plan that was submitted by New Haven Residential Treatment, and I have determined that coverage is not available under your child's benefit plan for the requested services of **Residential Treatment for educational purposes.**
>
> As described in the Mental Health Neurobiological Disorders - Autism Spectrum Disorder and Substance-Related and Addictive Disorders Services Exclusions section of your PricewaterhouseCoopers - NY Summary Plan Description, page 86: Services that are solely educational in nature or otherwise paid under state or federal law for purely educational purposes are excluded from coverage. (emphasis in original)

45. New Haven is a licensed residential treatment center in the State of Utah and its primary purpose is a therapeutic institution, it provides educational services only inasmuch as it is statutorily obligated to do so. R.M. appealed this denial.

46. In a letter dated September 29, 2020, United reviewer Howard Wong, M.D. again denied

payment for T.M.'s treatment at New Haven from September 23, 2020, forward. United

gave the following justification for the denial:

> We've denied the medical services/items listed below requested by you or your provider: Mental Health Residential Treatment as of 09/23/2020.
>
> You are being treated for problems with your mood and behaviors. Your request was reviewed by a doctor. You are cooperative and participating in treatment. We have denied the medical services requested after talking about your symptoms and treatment with the facility designee, who is your primary therapist.
>
> The criteria are not met because:
> - You do not need the care provided in Residential Treatment setting. [sic]
> - You could be treated in a less intensive Level of Care.
>
> In your case:
> - You are taking your medications and engaged in treatment.
> - You are medically stable.
> - You are able to learn and use coping skills.
> - You can control yourself better.
> - You are not feeling like harming yourself or others.
> - You are able to look after your day to day needs.
> - You do not have clinical issues requiring 24 hour monitoring in a Residential setting.
> - You have no mental health issues preventing treatment in a less intensive setting.
> - You have a safe place to live and the support of family.
>
> Care and recovery could continue in the Mental Health Intensive Outpatient Program (IOP) setting. Children and adolescents usually live at home during IOP treatment. Please discuss these options with your provider.

47. In addition, United sent the Plaintiff another denial letter which was also dated September

29, 2020, which examined the same dates of service as the other September 29, 2020

denial. This second letter was signed by Lee Becker, MD. and stated in part:

> We've denied the medical services/items listed below requested by you or your provider: Mental Health Residential treatment as of 09/23/2020.
>
> You are being treated for problems with your mood.

> Your request was reviewed. We have denied the medical services requested
> because we got information from your provider. The criteria are not met because:
> You have worked on your recovery by attending programming and taking your
> medication.
> You are not feeling like harming yourself or others.
> You do not have serious medical complications needing 24 hour care.
> You do not have substance use concerns.
> You have family support.
>
> Care and recovery could continue in the Mental Health Intensive Outpatient
> Program setting.

48. It is unclear why United conducted two separate reviews for the same period of treatment, nor is it apparent which denial letter is a response to his appeal or if neither or both letters are responses to his appeal.

49. On February 12, 2021, R.M. submitted a level two appeal of the denial of payment for T.M.'s treatment via an organization called Bridgeway. Bridgeway contended that the decision to admit T.M. to residential treatment was based on the recommendations of his treatment providers and that, based on their first-hand knowledge of T.M.'s needs and their examination and treatment of T.M., they were in the best position to come to accurate diagnoses and opinions about T.M.s treatment needs.

50. Bridgeway wrote that New Haven admitted individuals with symptoms including depression, anxiety, self-harm, suicidal ideation, eating disorders, substance abuse, and personality disorders. Bridgeway noted that T.M. struggled with all of these and had also attempted suicide.

51. Contrary to United's assertion that T.M. was "attending programming and taking your medication," Bridgeway shared medical records from T.M.'s time at New Haven where he refused his medications and refused to participate in programming.

52. Bridgeway also included medical records showing T.M. admitting to experiencing suicidal ideation, desires to self-harm, asking to be placed on safety status, writing a suicide note, experiencing body dysmorphia, feeling depressed and empty, and having trouble connecting with family all while in the supportive environment of a residential treatment center.

53. Bridgeway also reminded United it was subject to MHPAEA and referenced the court decision in *Wit et. al. v., United Behavioral Health* in which a federal district court had faulted United for its overly restrictive and inaccurate systematic application of medical necessity evaluation for individuals being provided residential treatment for mental health and substance use disorders.

54. In a letter dated April 30, 2021, Edward Collopy, M.D., denied payment for T.M.'s treatment from September 23, 2020, through November 23, 2020.

> Taking into consideration the available information, along with the locally available clinical services, it is my determination that the requested service did not meet the American Academy of Child and Adolescent Psychiatry (AACAP) Child and Adolescent Service Intensity Instrument (CASII) Version 4.1 required to be followed in the member's behavioral health plan benefits. Specifically, I will uphold the adverse determination for the MH-RTC LOC from 9/23/2020 through 11/23/2020. First, medical records were not provided for each appealed date of service. Therefore, the medical necessity for this treatment episode cannot be determined. From the clinical information provided, the member demonstrated variable compliance with treatment in terms of attending programming and school. Psychiatric progress notes indicated no changes in psychotropic medication regimen. No S/H[2] ideation or psychosis. Psychiatric progress notes also indicated no acute psychiatric safety concerns reported. On 9/30/2020, it was reported that the member was having thoughts to self-harm. There is no report of the member being evaluated for a higher level of care at that time or having an urgent psychiatric evaluation. It was reported that the member appeared to be doing better by bedtime on that date. No subsequent reports of active S/H ideation or self-injurious behaviors. No acute medical concerns reported. The member had family support. There were reports of sexually acting out behaviors, noted to be chronic in nature. No reported episodes of agitation or the need for PRN

---

[2] Suicidal/Homicidal

medications. The member could have continued her mental health treatment at a lower level of care.

55. In a letter dated June 11, 2021, the same United reviewer again denied payment for

T.M.'s treatment at New Haven. The letter was a largely a duplicate of the April 30,

2021, letter except it analyzed dates of service from July 9, 2020, through September 22,

2020. As noted above, it was again attributed to Edward Collopy, MD, and reused large

portions of his initial denial rationale with some alterations.

56. In order to minimize bias and more fully guarantee that a full and fair review is

performed, ERISA expressly prohibits the practice of reusing reviewers who have

previously evaluated a claim. United utilized Dr. Collopy to perform multiple reviews of

treatment at the same facility in spite of this prohibition.

57. The relevant language from the June 11, 2021, is reproduced below. Alterations from the

April 30, 2021, letter have been bolded for ease of comparison. Words in brackets denote

portions of the original letter which were excised from the June 11, 2021 letter.

> Taking into consideration the available information, along with the locally available clinical services, it is my determination that the requested service did not meet the American Academy of Child and Adolescent Psychiatry (AACAP) Child and Adolescent Service Intensity Instrument (CASII) Version 4.1 required to be followed in the member's behavioral health plan benefits. Specifically, I will uphold the adverse determination for the MH-RTC **Level of care** from **7/9/2020** through **9/22/2020.** First, **from 7/9/2020 through the beginning of September, [sic] 2020, authorization at this facility was unavailable due to service components not consistent with treatment guidelines. Subsequently, there was a LINX case note indicating that authorization, at this facility, at the MH-RTC Level of Care was available as of 9/2/2020. Between 9/2/2020 and 9/22/2020,** medical records were not provided for each appealed date of service. Therefore, the medical necessity for this **portion of the** treatment episode cannot be determined. From the clinical information provided, the member demonstrated variable compliance with treatment in terms of attending [programming and] school. **It was noted that the member participated in the milieu. The member and family participated in family therapy , [sic] which included a camping trip.** Psychiatric progress notes indicated no change[s] in psychotropic medication regimen. No S/H ideation or psychosis. [Psychiatric progress notes also indicated

no acute psychiatric safety concerns reported. On 9/30/2020, it was reported that the member was having thoughts to self-harm. There is no report of the member being evaluated for a higher level of care at that time or having an urgent psychiatric evaluation. It was reported that the member appeared to be doing better by bedtime on that date. No subsequent reports of active S/H ideation or self-injurious behaviors.] No acute medical concerns reported. [The member had family support. There were reports of sexually acting out behaviors, noted to be chronic in nature. No reported episodes of agitation or the need for PRN medications. The member could have continued her mental health treatment at a lower level of care.]

**CASII Scoring: incomplete medical records provided. …**

**Your request was reviewed. We have denied the medical services requested because We reviewed your medical records. The criteria were not met because:**

- **From 7/9/2020 through 9/1/2020, authorization at this facility was not available due to service components not consistent with treatment guidelines.**
- **From 9/2/2020 and forward, medical records were not provided for each appealed date of service to support that you needed continued mental health treatment in a 24 hour/day residential treatment setting.**

58. The Plaintiff exhausted his pre-litigation appeal obligations under the terms of the Plan and ERISA.

59. The denial of benefits for T.M.'s treatment was a breach of contract and caused R.M. to incur medical expenses that should have been paid by the Plan in an amount totaling over $275,000.

60. United failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of R.M.'s requests.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

61. ERISA imposes higher-than-marketplace quality standards on insurers and plan

administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

62. United and the Plan failed to provide coverage for T.M.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

63. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiff in the pre-litigation appeal process. 29 U.S.C. §1133(2).

64. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiff's appeals or whether it provided them with the "full and fair review" to which they are entitled. United failed to substantively respond to the issues presented in R.M.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

65. In fact, not only did United not respond in any substantive capacity to R.M.'s arguments, it also failed to abide by many of its other responsibilities under ERISA and even engaged in practices which are expressly prohibited by the statute such as using Dr. Collopy to conduct multiple reviews when he had already previously issued a denial letter.

66. United also based its decision to deny payment in large part on factors which are not required anywhere in the insurance contract, generally accepted standards of medical

practice, or its own insurance guidelines.

67. For instance, it listed "No acute medical concerns reported" and "You are medically stable" as justifications for the denial of payment. Neither generally accepted standards of medical practice nor any of the terms and conditions of the insurance policy require an individual to be in medical distress in order to receive mental health treatment. In spite of this, United repeatedly offered these assertions and other extra-contractual requirements such as these to justify its decision to deny payment.

68. United and the agents of the Plan breached their fiduciary duties to T.M. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in T.M.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of T.M.'s claims.

69. The actions of United and the Plan in failing to provide coverage for T.M.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

### SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

70. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

71. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

72. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

73. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

74. The medical necessity criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

75. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for T.M.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

76. For none of these types of treatment does United exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement

for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

77. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

78. United and the Plan evaluated T.M.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

79. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, United's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that T.M. received.

80. United's improper use of acute inpatient medical necessity criteria is revealed in the statements in United's denial letters such as "Psychiatric progress notes also indicated no acute psychiatric safety concerns reported."

81. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that T.M. received.

82. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

83. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute

claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

84. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

85. R.M. also identified other violations of MHPAEA. He contended that the National Uniform Billing Committee, the organization responsible for developing and issuing revenue codes for services, had assigned wilderness programs their own separate revenue code.

86. He pointed out that United used this revenue code to flag these facilities and automatically deny them. United does not do this for analogous medical or surgical facilities, nor does it categorically exclude any other analogous medical or surgical facility with a National Uniform Billing Committee billing code as experimental or investigational.

87. As another example of the Plan's improper application of its criteria to evaluate the treatment T.M. received, the Defendants relied on assertions such as "[y]ou are able to look after your day to day needs" as a justification to deny treatment. In fact, this serves as an indicator rather than a contra-indicator of the medical necessity of treatment in a non-acute residential setting.

88. The actions of United and the Plan requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance

use disorders and in requiring accreditation above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

89. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

90. United and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that United and the Plan were not in compliance with MHPAEA.

91. In fact, despite R.M.'s request that United and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, United and the Plan have not provided R.M. with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, United and the Plan have not provided R.M. with any information about the results of this analysis.

92. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for his loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for his loss arising out of the Defendants' violation of MHPAEA.

93. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for T.M.'s medically necessary treatment at Outback and New Haven under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.      Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's

Second Cause of Action;

3.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.      For such further relief as the Court deems just and proper.

DATED this 14th day of March, 2022.

By      s/ Brian S. King
Brian S. King
Attorney for Plaintiff

Counties of Plaintiff's Residence:
Denton County, Texas. Collin County, Texas.